UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
===============================================X

UNITED STATES OF AMERICA,                    Case No. 18-cr-859

               Plaintiff,

   -against-

STEVEN HENNING,

               Defendant.
===============================================X

---

## SENTENCING MEMORANDUM

---

Michael K. Burke, Esq.
Hodges, Walsh & Burke, LLP
55 Church Street, Suite 211
White Plains, NY 10601
(914) 358-6000

Steven Henning respectfully submits this memorandum in aid of sentencing, which is scheduled for January 29, 2020. On June 24, 2019, this Court accepted his plea of guilty to a superceding information charging him with two counts of wire fraud pursuant to 18 U.S.C. §1343. Steven Henning has also agreed to restitution and forfeiture in the amount of $938,246.

## PRELIMINARY STATEMENT

Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables conflicts with common sense. *United States v. Gupta*, 904 F. Supp.2d 349, 350 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014) Steven Henning is a loving husband and father of three children has accepted responsibility for his conduct. Steven very much regrets and feels humiliated by his conduct in this case. The mistakes he made in this case stand in stark contrast to his otherwise exemplary life. Nothing in this memorandum is meant to minimize the significance of the charges; however, we respectfully request the Court in the context of the circumstances and sentence him to a  below guidelines sentence based on the factors set forth below in 18 U.S.C. § 3553(a)(2).

We can start with the general agreement that crimes involving wire and securities fraud are serious. In the instant case, however, Dr. Henning did not financially gain or benefit from his conduct involving OpportunIP.

He did however, financially gain in salary draws from his brief consulting relationship with ███████████ referenced in Count 2 of the superceding information when he drew down on the $240,000 salary. As to Global Economics he did not deliver on the business that he represented he had coming over with him from Marks Paneth and made representations

that the business leads were more developed and further along in the process than they were. However, even though he drew down on his salary he did generate collectables of $96,000 during his brief relationship with ~~VICTIM 2~~ (12/5/2019 Victim Impact letter).

## RELEVANT CASE LAW AND 3553(A) FACTORS

The overriding principle of 3553(a) requires a district court to impose a sentence "sufficient, but not greater than necessary," to satisfy the four purposes of sentencing set forth in 3553(a)(2). The four purposes of sentencing set forth in 3553(a)(2) are: (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant and (D)to provide the defendant with the needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

In determining whether the sentence is sufficient to comply with the 3553(a)(2) purposes of sentencing factors listed in§ 3553(a). These factors are:

> (1)  the nature and circumstances of the offense and the history
> and characteristics of the defendant;
> (2)  the kinds of sentences available;
> (3)  the now advisory sentencing guidelines and policy
> statements;
> (4)  the need to avoid unwarranted sentencing disparity; and
> (5)  the need to provide restitution where applicable.

None of these factors are to be given greater emphasis than another. However, all of the factors are subservient to the overriding mandate to impose a sentence not greater than necessary.

2

### a. 3553(a)(l) History and Characteristics of the Defendant and Nature and Circumstances of the Offense

When analyzing the characteristics of the defendant one must read 3553(a)(l) in conjunction with 18 U.S.C. § 3661 which provides that "no limitation shall be placed on the information concerning the background character and conduct of [the defendant] which a court may receive and consider for the purpose of imposing an appropriate sentence. Thus, the court can consider a variety of factors regarding the defendant's background and character such as:  his age, his mental and emotional maturity level, and educational or vocational skills.

Judge Rakoff eloquently stated with respect to personal history and characteristics of a defendant "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006).  Judge Rakoff went on to comment on this elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant." *Id.*

Steven Henning violated the law but he should not be judged solely by his worst moments and conduct. His life is so much more than that, and full of good. He should also be judged in accordance with his positive history, contributions and characteristics. Steven Henning, age 59, is a devoted father, husband, brother and son. He is deeply committed to his family, community and was committed to his work and partners at Marks Paneth until OpportunIP unraveled.  Prior to his role as Partner at Marks Paneth, Dr. Henning had an exemplary career

beginning with his education that includes a PhD in accounting and economics from the University of Wisconsin, an MBA in management from the University of Miami, and his CPA license. In addition to his most recent employment Dr. Henning worked as an accountant and in other financial leadership roles at major accounting firms. He is also an accomplished academic having served as an assistant professor at the University of Colorado and Southern Methodist University and as an academic fellow with the Securities and Exchange Commission. Prior to the conduct at issue, Dr. Henning had never been professionally disciplined and he has no prior criminal record.

Dr. Henning did not grow up wealthy or privileged, as one of seven children he learned the value of hard work and caring for others at a young age. Though he had a generally happy childhood, at the age of six he lost his father, the main family provider. His mother did her best but he has never forgotten the poor socio-economic conditions of his upbringing – this has guided him in much of the service work he has done for the community. Dr. Henning is the sole provider for his wife, Ann, whom he has been married to for 33 years. Ann and Steven have known each other for their entire adult lives after they met at University of Wisconsin. They have almost never been apart. They have three adult children, Joel, age 26; Craig age 24, and Claire, age 22. As is evidenced by their attached character letters, they are all very supportive and fond of their father and look to him as their role model. (Ex. B) These letters submitted to the Court attest to Stephen's dedication to and support of his family and how much they love and depend on him. A defendant's family responsibilities are a recognized reason for a downward variance. See, e.g., (sentence of one year and a day for a man facing a guideline range of 46-57 months for possessing with intent to distribute heroin because of his long work career, community support, lack of criminal record, and responsibilities as sole supporter of 8 year-old

son and elderly parents, which reduced the likelihood he would re-offend); *United States v. Davis*, 2008 WL 2329290, at *5 (S.D.N.Y. June, 5 2008) (sentence of time served for first time offender devoted to the education of six children of fifteen-year marriage).  In addition to his professional accomplishments Dr. Henning has been committed to service for others by engaging in service projects in low income neighborhoods and being an active member of the churches he has attended over the years. This dedication, along with the continued support of his family, ensures that Dr. Henning will continue to be a productive and positive member of society after his sentence has been served.

### 1. **Aberrational Conduct**

Dr. Henning's conduct reflects an aberration in his otherwise distinguished career. OpportunIP was a side business investment opportunity. Dr. Henning put in over $380,000 of own his money and did not take a salary. None of the ████ money went to Steven Henning or was used by him for personal expenses or to sustain a lavish lifestyle. As a result of his fraudulent conduct his career is over, he has lost his license as a CPA and has millions of dollars of judgments against him. OpportunIP was a failed business venture and when pressed to show results, Dr. Henning made very poor decisions and created documents to try and show that the deals were fuether along. This was in not to mask that the money was used for personal expenses as is exhibit in attachment Ex B all of the 2 million dollars is accounted for in paying consultants, lawyers a failed investment to a concert promoter. Approximately $900,000 of the 1.5 (2 million less the $500,000 Radich note) was paid back to the ████ and the family trust as part of the Texas settlement. Ex. C)

### 2. <u>The Nature of the Offense Conduct</u>

OpportunIP was a business venture that Steven started while he was a partner at ██████ [EMPLOYER]

██████ Accounting Firm. Dr. Henning was employed at ██████████ [EMPLOYER] for 12 years a certified

public accountant and consultant. (PSR ¶ 9 He was the partner-in-charge of the advisory services

and served on the executive committee of the accounting firm. *Id.*  Previously, he was employed

as a professor of accounting at University of Texas, University of Colorado and Sothern

Methodist University.  When OpportunIP was initially established ████████ [EMPLOYER]'s partners

invested in the business and were paid over $240,000 in fees for consulting work performed for

or on behalf of OpportunIP. (Ex. A) Similarly, the law firm Clark Hill was paid hundreds of

thousands of dollars for legal work performed for OpportunIP in drafting the licensing in and

licensing out agreements and ensuring patents were properly filed. In essence, OpportunIP would

license in inventors who had patented their inventions (Intellectual Property "IP"). OpportunIP

would then attempt to bring their inventions to market by licensing in businesses or

manufacturers who would be interested in using this IP in their products. In exchange for

assisting the inventors, OpportunIP would be paid a percentage of the profits if the invention was

accepted and licensed in by a business or manufacturer. From 2010 to 2015 Steve Henning

invested $383,976 of his own money for consultants, development of prototypes, travel, legal

fees.

He also invested the 1.5 million invested by ████████ [VICTIM 1] and his family to try and

marry inventor and manufacturer through the license in license out arrangement. Needlessly to

say, this was a risky investment of his and others money. Investing in inventors and possible

firms being interested in picking up the product or incorporating the idea into to an established

product.

b.  The sentences available (3553(a)(3)) and the need to avoid unwarranted sentencing disparity (3553(a)(6))

The need to avoid unwarranted sentencing disparities is also a factor that can be considered where there is no loss. *See United States v. Tennant* (where Judge Batts found that the Government failed to establish a fraud loss and sentenced the defendant to time-served and three years of supervised release). Moreover, the deterrent purpose of sentencing will be sufficiently met with s sentence of a year and day by the Probation Department's oversight during supervised release.

The defense believes that the adjusted sentencing range of 51 to 63 months for a person with no criminal history who's personal gain was out weigh by his own lost investment is beyond greater than necessary to reflect either the seriousness of the offense, the need for deterrence, to protect the public from further crimes of this defendant, or to provide any treatment which may be appropriate. We disagree with Probation and believe that a non-guideline is warranted. We are asking that Court sentence Dr. Henning to a sentence of a year and a day and a period of home confinement followed by 3 years of supervised release.

c.  The offense level in this case overstates the severity of the offense

Dr. Henning disagrees with the severity of the suggested punishment for this particular offense as a potential basis for a sentence below the suggested Guidelines range. We are in no way attempting to minimize conviction or his conduct but to point out all of the sentencing enhancements in particular the 16-level fraud loss enhancement when applied drive up the years of incarceration.

7

**d. The fraud loss guidelines overstate Steven Henning's misconduct.**

The guidelines overstate Steven Henning's conduct because they are driven by the arbitrary "loss table" in fraud guideline section 2B.1.1, which should not have persuasive force in determining his sentence. *See, United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (Sentencing Commission could have assigned an offense level that reflects the seriousness of the criminal conduct rather than assigning a base offense level and then leaving the sentence to be driven primarily by the loss amount); *see also United States v. Jergensen*, 2019 WL 6587680, at *3 (2d Cir. Dec. 5, 2019) (acknowledging that "loss can be an imperfect measure of the seriousness of an offense" and that the Court can vary from the Guidelines on that basis); *United States v. Johnson*, 2018 WL 1997975, at *4 (E.D.N.Y. 2018) (Court varied downward from the excessive Guidelines sentence holding that "[w]here application of the loss enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more heavily on the § 3553 factors"). Prior to *Algahaim,* another court in this district explained that section 2B1.1's loss table "appears to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology – thus maximizing the risk of injustice." *United States v. Gupta*, 904 F. Supp. 2d. 349, 351 (S.D.N.Y. 2012) (high-profile securities fraud case where the defendant, a high ranking Goldman Sachs Executive, was convicted at trial and had a corresponding guideline range of 78 to 87 but the court granted downward variance to a sentence of 24 months because the fraud loss table overstate the severity of the offense).

Dr. Henning's total adjusted offense level is 24 with a corresponding guideline range of 51 to 63 months. (PSR p. 22) Sixteen of the twenty four levels are as a result of the fraud loss enhancement under the fraud loss table . (PSR ¶ 46-58) While the increases in white collar

sentences have resulted in part from congressional mandate, the Sentencing Commission botched the execution of the mandate. In implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.  Undoubtedly, this Court can depart downward based on the lack of empirical evidence supporting the section 2B1.1 loss table and the fact it overstates Stephen Henning's wrongful conduct in this case. See *Kimbrough*, 552 U.S. at 109-10).

As is outlined on the summary exhibit B  of the 2 million dollars from ~~Anthony Sarti~~ [VICTIM 1] and his family's Trust $500,000 was a loan and did not go to Steve Henning or a related entity it went directly to David Raduch, Esq., an attorney who on the side was an inventor who developed an idea and protype for a scope for a rifle who was in personal financial trouble. (See, PSR ¶ 12 and Ex. C settlement agreement including assignment of Rudich note) Of the remaining 1.5 million Ex B outlines that the money was paid to lawyers, consultants, other investments and paid pack to ~~[VICTIM 1]~~. Over $900,000 of the 1.5 million was paid back as part of the settlement in the Texas litigation. Ex. C.

e.   The offense level overstates the need to protect the public from further crime and the need for deterrence

Dr. Henning falls into Criminal History Category I because he has *no* prior criminal history points. He has no points because he has no prior convictions. In fact, Dr. Henning has no prior contact with the criminal justice system and his criminal history would be more

aptly referred to as criminal history category "0" if there was such a category. This is an area in which the Sentencing Commission has done some homework. In its 15-year report, it found that defendants who fall into Category I due to *no* prior criminal history points are the *least* likely to re-offend. *See* United States Sentencing Commission, Recidivism and the First Offender at 13-14 (May, 2004) (reflecting recidivism rate of 11.7 percent for offenders with 0 criminal history points, as opposed to a 22.6 percent rate for those with one criminal history point), available online at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf.

An older first-time offender like Dr. Henning warrants a non-Guidelines sentence because defendants who are over the age of forty "exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Carmona-Rodriguez,* 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005); *United States v. Hernandez,* No. 03 CR. 1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005). The demographic information, including a significant work history, lack of drug use, education, and other socially beneficial traits, tend to describe those who have no criminal history points. *See* http://www.ussc.gov/publicat/ Recidivism_FirstOffender.pdf at 6-8. Therefore, it appears that a lengthy sentence to protect the public is not a factor that weighs against Dr. Henning. Rather, it is one which indicates that a lengthy sentence is not necessary in this case.

As for deterrence, Dr. Henning's involvement in this case and conviction has ended his career, millions of dollars of judgements against him and the loss of his CPA license. Moreover, "there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson,* 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006). Therefore, the statutory factors of protecting the public

and deterrence are overwhelmingly undermined by imposing the sentence suggested by the Guidelines computation in this case.

### f. The Need to Avoid Unwarranted Sentence Disparities

As the Court considers the offense conduct, we respectfully set forth a comparison of the specific conduct before the Court with the actions of the other defendants in related cases so that the Court can "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In so doing, we are not minimizing the seriousness of the violation in this case. Rather, we respectfully submit that Steven Henning's conduct, on a comparative basis, warrants significantly less punishment.

"Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge." Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing*?, 23 Touro L. Rev. 539, 539 (2007). While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind." See *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.,* 142 U. Pa. L. Rev. 513, 513 (1993); see also Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979), reprinted in 82 F.R.D. 209, 209 (1979) ("Be kind. If judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous

people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases.").

## CONCLUSION

Dr. Henning has pleaded guilty. He realizes that his conviction requires a sentencing hearing to arrive at some form of punishment. Given Steven Henning's unlikelihood of recidivism, and the collateral financial impact on him and his children it is respectfully requested that, for these reasons and the other reasons set forth above, we urge the Court to sentence Dr. Henning to a reasonable sentence of a year and a day followed by three years supervised release which would serve as a sentence a but not greater than necessary to address his conduct.

Respectfully submitted,

Michael K. Burke

EXHIBIT A

January 20, 2020

Honorable Cathy Seibel
United States District Court Judge
United States District Court
300 Quarropas St.
White Plains, NY 10601

RE: Character Reference for Steven Henning

My name is Ann Henning. I am 56 years and have been married to Steven Henning for 33 years.
I met him in 1985, the year I graduated from the University of Wisconsin ("UW") with a Bachelor of Arts
in Accounting. I worked in the profession until our eldest son was born and have been a homemaker
since 1993. I have been actively involved in PTA in our kids various schools, occupying positions of
President and Treasurer along the way. I have been a treasurer for both our church and Treetops
Chamber Music Society.

When Steven and I met we hit it off right away. We are both from large families having 6 siblings each.
Family was so important to both of us and has continued to be so to this day. We met and married
within a year.

Over our years together we have moved nine times. My biggest considerations were his job
opportunities and our family life. He always took both considerations into account before we made a
joint decision to move. Steve had numerous professional opportunities and went back to school for both
a Masters and Ph.D. during our marriage. We knew this was a commitment to working together for a
better family life.

Steve taught at UW, University of Colorado at Boulder and SMU. At each place he received teaching
awards and was asked to be on various committees within the business school. He so enjoyed working
with the students and would invite former students to our home for meals with our family. Our kids
loved meeting the students and some of these former students are still in contact with him today.

In each locale we found a church to worship at. Steve was tapped for the Board of Elders and became a
treasurer. We were always actively involved in our church activities and all of us spent many hours
volunteering for the many activities offered for membership and the community.

Steve has an ability to talk to anyone. He is not intimated by titles and can remain calm through any
situation. Over our years it's been amazing to meet his various friends in and outside work. They are
such a varied bunch and from so many different backgrounds.  During our international travels to
conferences he was often asked to make presentations on various topics. He is well versed on so many
topics and has the ability to connect with his audience and keep them engaged.

He's always been a natural leader and this gets recognized at each job. He gets pulled in to leadership roles even when it's not what he would prefer. He is very good at problem solving and communicating a solution to issues.

Steve has always been a strong family man. He has always treated each of us with the utmost respect. His commitment to family extends beyond just our immediate family. When we first met he took to my younger brothers as if they were his own brothers, and would take them to sporting events and other places. We have spent many vacations with our extended families over the years. Steve's sense of humor and fun makes him a joy to be around. All generations appreciate him. He provides important monetary and physical support to his mother and aunt who are both elderly and have multiple properties to manage.

I am aware Steve has pleaded guilty to the charges he faces. We understand this this is another situation where we need to support him in order to get through. We know this will not break us apart and will make us stronger. This has made us again realize our family is most important. It has strengthened our bonds.

Steve has always been a positive influence on the people around him and I hope you will take that into account at his sentencing.

/s/ Ann Henning
203-570-6611
achslh@yahoo.com

January 20, 2020

Honorable Cathy Seibel
United States District Court Judge
United States District Court
300 Quarropas St.
White Plains, NY, 10601

Re: Character Reference for Steven Henning

My name is Craig Henning and I am 24 years old. I am Steven and Ann Henning's middle of three children. I got my Bachelor of Business Administration in Finance and Accounting at the University of Miami and graduated in May 2018. I graduated from the University of Miami in May of 2019 with a Master of Science in Finance. Upon graduation, I moved back home to Connecticut and work for Arcilia, a small family investment office in Greenwich, CT. I am an investment associate that focuses on equity and fixed income research.

As an undergraduate student at UM I was involved in Alpha Kappa Psi, a business fraternity that focused on character development and community outreach. Some of the community outreach I was involved with including picking up trash on the beach and ocean, volunteering at soup kitchens in economically disadvantaged Overtown, FL and reading stories to sick children at a local hospital.

My dad has been a very steady presence in my life from little on. I would not be close to the man I am today without both of my parents being so involved. Growing up my dad always found time to coach my little league baseball teams and basketball teams. My teams loved coming over to my house for batting practice in the batting cage that we built together and my dad was often the favorite of my teammates for the ribs that he made on the grill and because of the tips he was able to provide on our swings. He has an incredible passion for sports that he passed onto me and because of that he and I would often travel to football or baseball games together. He loved taking a couple of my friends and I to sporting events in New York City and other places locally. Our passion even extended to us hosting a baseball camp in low income areas of Bridgeport, CT for two summers in a row.

As the child that was most similar to my dad, I was often lucky enough to travel with him on business trips both in the United States and abroad. It was through that traveling with my dad that I discovered my love of traveling and that I had his passion for meeting new people. One trip that I will never forget is when he and I went to Dubai for him to speak at a conference for chartered accountants. On the business trips that I joined him on, I saw the level of respect that his co-workers had for him and that made me appreciate him even more.

My father has always drilled in me to show compassion and kindness towards others. This has always been one of my biggest strengths as it allows me to befriend people from all walks of life. One thing that I'll never forget about my dad is how much he was able to help some of my friends without thinking twice about it. My best friend is a first generation American from El Salvador who did not have the means to attend college. My dad without hesitation offered to pay for him to attend Central Connecticut State University, where after four years he became the first person in his family to graduate from college. My dad also volunteered to pay for one of my college roommates rent because he wouldn't have been able to live with me if he didn't. Not only was he preaching kindness, he lived it in his daily interactions.

Over the last few months I have had the pleasure of picking up stained glass work with my dad in our free time. He's taught me the ins and outs of working with glass and we have created some cool pieces that we have given to family and friends. Eventually my dad would like to open a stained-glass studio/store where he can teach lessons and sell the beautiful pieces that we have brought to life.

My mother and I were with my dad when he was arrested and we have gone to multiple court hearings to show our support for him. Since I live in the area, I will attend every hearing or meeting that I can because of how much he means to me.

I am aware that my dad pleaded guilty to the charges that were brought against him and I will support him through it all. My family has only grown stronger because of all this and the support for each other is overwhelmingly positive. Nothing will be able to break the bond that I have with my father.

My dad and my family are looking forward to having this behind us and we are thinking about opportunities to pursue in the future.


Sincerely,

/s/ Craig Henning
203-391-4369
henning.craig7@gmail.com

January 20, 2020


Honorable Cathy Seibel
United States District Court Judge
United State District Court
300 Quarropas St
White Plains, NY 10601

Character Reference for Steve Henning


My name is Joel Henning. I am 26 years old, the eldest child of Steven and Ann. I live in Austin, TX. I attended the University of Texas ("UT") and received a Bachelor of Science degree in Computer Science. I work for Marqeta, a financial services payment processing company, as an Engineer in their Cyber Security Department. In my spare time I work on my garden food plot and help with property maintenance for the cooperative that owns and runs the gardens. I also am part of a committee that liaises between the Austin business community and Austin city government. This committee provides information about impact of proposed rule-making on the Austin business community.

While a student at UT, I started a Cyber Security club within the School of Computer Science. We hosted speakers from local and national technology businesses to discuss issues and challenges in the field.  I also worked with the College of Natural Sciences Dean to set up a lab to teach students about hacking and how to combat it. The Cyber Security club and the hacking labs became an important recruiting tool for the School of Computer Science.

My father has always been an integral part of my life. Early in my life my dad was getting his PhD and we were so close. We spent a lot of time outdoors hiking and skiing. We both have a love of the outdoors and enjoy nature, so hiking is a shared love. We also have road tripped a few times from Dallas to Minneapolis and WI to CT.

As a family we have been actively involved in community activities. When I was in middle school, we joined a school group working to build the Mill River playground in a park in Stamford, CT. He took me to lacrosse tournaments in the area. I developed my love for travel from him as his work took us many places overseas. We are actively involved in our church. I participated in the annual Christmas program with other children and teenagers. I also was a volunteer each year with their Christmas and Easter for Kids programs helping lead the kids throughout the activities.

My dad was my first baseball coach and worked hard to give us pointers to improve our skills while keeping it fun. He thought sports participation was important for the group team building skills it developed. I particularly liked basketball and my father was a coach for that activity as well.  He supported my interest in lacrosse, even though he knew little about that sport prior to my involvement in it.

My friends often wonder where I received my sense of humor and funny comments. Once they meet my father they understand. He and I have always had a similar manner in dealing with people. We both are comfortable talking and working with people from diverse backgrounds.

My father always was willing to help my friends with college applications and scholarship essays. He would help them refine their ideas and edit their essays. This assistance helped many of my friends avoid the costs to hire professionals that provide this service.

I also love to cook. My father fostered this skill in me too as he is often working in the kitchen. I love to entertain my friends just as my parents did while I was growing up. We are both always looking for new recipes and share the winning ones.

I am fully aware that my father has pleaded guilty to the charges he faces. I support him and love him as before. I also worked with my mother to provide the security for terms of his bail.

I hope you can see the good in my dad from the letters me and my siblings provide. I understand my mom was interviewed by a probation officer, and I can assure you she still loves my father as we do.

Thank you for reading this letter.

Sincerely,

/s/ Joel Henning
203-252-1930
joelshenning@gmail.com

January 20, 2020

Honorable Cathy Seibel
United States District Court Judge
United States District Court
300 Quarropas St.
White Plains, NY 10601

Re: Character Reference for Steven Henning

My Name is Claire Henning and I am the daughter of Steven and Ann Henning. I am 22 years old and the youngest of their three children. I am a fifth-year graduate accounting student at the University of Florida ("UF"). I will graduate in May 2020 with a Master of Science in accounting and a Bachelor of Science in accounting. I had an internship last summer with a Big Four Accounting firm and have secured a full-time position once I graduate.

While a student at UF, I have been involved in activities to raise money to support families with children being treated at UF Children's' Hospital. In particular, the I've work with the March of Dimes to raise money for babies in the Neonatal Intensive Care Unit at UF Children's Hospital. I also volunteer with the Humane Society to provide foster care for kittens and puppies that are too young to be adopted.

I have been actively engaged with my parents my entire life. They both mean the world to me. My father was an active father my entire life even though he had a busy work and travel schedule. He was always there for me and supported me in various activities I was involved with. For example, he was a coach of my youth basketball team and softball team. Not only was he there for me, but we hosted my teammates at our house for a variety of activities to bring us closer together. Many of my friends still talk fondly of the times they spent at our house. My friends are quite fond of my father; he is both funny and engaging and makes others feel at ease soon after they first meet him.

We were fortunate to travel internationally because of my father's business activities. The exposure to different cultures, people and languages helped me to have a greater understanding of issues in the world around us and has given me the confidence to make my own way in my university and professional lives. Because of that confidence and with my parents' support, I trained to become a Pure Barre exercise instructor and I have been teaching courses in Gainesville, FL and Orlando, FL for more than two years. The ability to lead large groups in coordinated exercise routines will certainly help me in the coming years.

My father has had an accomplished professional career, but he is so much more than that. He is dedicated to his family, both immediate and extended. He always puts others' needs before his own and is an upbeat and charitable person. He gave much of his time for community activities, such as helping others in the community build a local playground and putting on a baseball clinic for high risk youth in a low-income neighborhood.

I am aware that my father pleaded guilty to the charges he faces. I am sad it has come to this, but I respect him and love him for being open with me. This is so contrary to my father's character, but I am very proud to have him as my father. He is the best and I will support him no matter the consequences.

I have been unable to attend any of his court hearings because of my own university and work schedule. That should not, in any way, be construed as a lack of support. In fact, I can tell you that our entire extended family still supports us and my father. That support and closeness will get us through this, and we'll be stronger as a result. I recognize how special our family relationships are.

Since his arrest, my father has taken up stained glass artwork again. He's made several beautiful 3-D pieces that he has been able to sell. He has also offered lessons on the stained-glass process and would like to open a store to sell artwork, supplies and creations he crafts.

He will continue to contribute positively to society, so I hope you can appreciate the good in him as you contemplate his sentence.


Sincerely,

/s/ Claire Henning
203-321-9204
cehach@yahoo.com

EXHIBIT B

Use of Proceeds:

| Date | Amount | Description |
|---|---|---|
| **Sources:** | | |
| 11/24/14 | 500,000 | Loan made by ABL Lab, LLC directly to David Rudich |
| 11/21/14 | 500,000 | Inbound wire transfer from ▓▓▓ VICTIM 1 |
| 10/9/15 | 1,000,000 | Inbound wire transfer from Dallas investors |
| | 2,000,000 | Alleged advance |
| | | |
| **Uses:** | | |
| 11/24/14 | (500,000) | Loan made by ABL Lab, LLC directly to David Rudich |
| 11/21/14 | (247,280) | Wire transfer to ▓▓▓ EMPLOYER for OpportunIP expenses |
| 12/11/14 | (42,415) | Wire transfer to Clarke Hill for OpportunIP expenses |
| 2/9/15 | (100,000) | Investment in Rise Souffle Holding; enticed to invest by ▓▓▓ VICTIM 1 ▓▓▓ in a business started by a family friend of his |
| 11/13/15 | (55,762) | Wire transfer to Clarke Hill for OpportunIP expenses |
| 12/15/15 | (150,000) | Wire transfer to ▓▓▓ VICTIM 1. Paid to ▓▓▓ since ▓▓▓ VICTIM 1 did not want Deutsche Bank to see the transaction |
| 12/31/15 | (35,000) | Wire transfer to David Rudich for firearm scope project |
| 1/15/16 | (120,000) | Estimated state and federal income tax payment |
| 4/1/16 | (12,000) | Wire transfer to David Rudich for firearm scope project |
| 5/6/16 | (96,250) | Wire transfer to Fetty Wap Touring for investment in concert |
| 11/7/16 | (10,000) | Wire transfer to OpportunIP Management for ▓▓▓ VICTIM 1 |
| 11/21/16 | (12,500) | Wire transfer to OpportunIP Management for ▓▓▓ VICTIM 1 |
| 12/23/16 | (30,000) | Wire transfer to ▓▓▓. Paid to ▓▓▓ since ▓▓▓ VICTIM 1 did not want Deutsche Bank to see the transaction |
| 12/24/16 | (40,000) | Wire transfer to David Rudich for firearm scope project |
| 1/30/17 | (5,000) | Wire transfer to ▓▓▓. Paid to ▓▓▓ since ▓▓▓ VICTIM 1 did not want Deutsche Bank to see the transaction |
| 2/3/17 | (10,000) | Wire transfer to ▓▓▓. Paid to ▓▓▓ since ▓▓▓ VICTIM 1 did not want Deutsche Bank to see the transaction |
| | 533,793 | Excess of sources over business uses |
| | (528,744) | Investments from unused proceeds, returned to investors |
| | 5,049 | |

Exhibit C

Cause No. 096-291731-17



|  |  |
|---|---|
| ████████████████████<br>████████████████████<br>VICTIM 1 | § IN THE DISTRICT COURT<br>§<br>§<br>§<br>§ |
| VS. | §<br>§<br>§ |
| ████████████████████<br>████████████████████<br>████████████ | § 96th JUDICIAL DISTRICT<br>§<br>§<br>§ |
| VS. | §<br>§ |
| STEVEN L. HENNING, ANN HENNING,<br>AND HENNING FAMILY PARTNERSHIP | § TARRANT COUNTY, TEXAS |



## MUTUAL SETTLEMENT AND RELEASE AGREEMENT

THIS MUTUAL SETTLEMENT AGREEMENT AND RELEASE AGREEMENT ("Agreement") is entered into by and between Plaintiffs ████████████████████ ████████████████████ (collectively "Plaintiffs"), and Defendants Steven L. Henning, Ann Henning, and the Henning Family Partnership (collectively "Defendants"). Plaintiff and Defendants shall be collectively referred to as the "Settling Parties" to this Agreement.

### WITNESSETH

WHEREAS, All disputes and claims between the Settling Parties in the above-styled and numbered cause in the 96th Judicial District Court of Tarrant County, Texas, hereinafter referred to as the "Lawsuit", are being concluded by the execution of this Agreement; and

WHEREAS, The Settling Parties represent and warrant that no other person or entity other than the aforementioned and undersigned participants have or have had any interest in the claims, demands, obligations, or causes of action referred to in this Agreement and that they have the sole right and exclusive authority to execute this Agreement, themselves or by and through their attorneys of record.

NOW, THEREFORE, in consideration of these promises and other good and valuable consideration, the Settling Parties agree as follows:

1.     The Settling Parties agree that the forgoing recitals are correct to the best of their knowledge and form a part of this Agreement.

2.     The Settling Parties expressly recognize and agree that this Agreement is a contractual agreement for the purpose of advancing the mutual best interests of the Settling Parties hereto.

3.     Defendants agree to make, and Plaintiffs agree to accept the following payments. The following payments are hereinafter collectively referred to as the "Settlement Payments:"

     a.  One (1) initial payment in the amount of $900,000.00 by August 18, 2017 in;
     b.  Assignment of the Rudich $500,000.00 Note (Exhibit A);
     c.  Assignment of the Rise proceeds from the Separation Agreement (Exhibit B);
     d.  $1,050,000.00 by January 31, 2017

The obligations in Paragraph 3, as well as all other obligations in this Agreement are secured in part by:

- Agreed Judgment in the amount of $3,000,000.00 (Exhibit C);
- Deed of Trust on 541 Westover Road, Stamford, Connecticut (Exhibit D);
- Agreed Order to Appoint Receiver (Exhibit E)

4.     The Settlement Payments shall be made in the form of cashier's checks or wire transfer payable to "Padfield & Stout Trust Account" and received by the applicable date due in the offices of Padfield & Stout, L.L.P., 421 West 3rd Street, Suite 910, Fort Worth, Texas 76102. Time is of the essence with respect to the due dates for each Settlement Payment.

5.     Contemporaneously with the signing of this Agreement, Defendants shall sign and return to Plaintiffs the following:

     a.  The Assignment of the Rudich $500,000.00 Note, hereinafter referred to as "Rudich Note", attached hereto as Exhibit "A."
     b.  The Assignment of Rise Soufflé Holdings, LLC proceeds, hereinafter referred to as the "Rise Assignment", attached hereto as Exhibit "B"
     c.  The Agreed Judgment, hereinafter referred to as the "Agreed Judgment", attached hereto as Exhibit "C;"
     d.  Deed of Trust on 541 Westover, Stamford, Connecticut, hereinafter referred to "Deed of Trust", attached hereto as Exhibit D
     e.  The Agreed Order Appointing Receiver, hereinafter referred to the "Receivership Order", attached hereto as Exhibit "E"
     f.  The Agreed Judgment of Garnishment as to Garnishee Bank of America, hereinafter referred to the "BOA Judgment", attached hereto as Exhibit "F";
     g.  The Preferred Unit Redemption Agreement, hereinafter referred to the "Redemption Agreement", attached hereto as Exhibit "G";

6.     Counsel for Plaintiffs will hold the Agreed Judgment in its file and take no action to submit the Agreed Judgment to the Court for entry unless there is a default of this agreement or a misrepresentation by Defendants concerning their financial status or real property owned. Should any Defendant become in default of this Agreement, Plaintiffs will credit the Agreed Judgment with any consideration set forth herein in Paragraph 4 received by Plaintiffs prior to

such default, and may then execute on said Agreed Judgment by any lawful means.  In regards to defaults concerning misrepresentations of financial status or real property owned, Mediator Robert Jenevein ("Mediator") shall be charged with making a determination whether a default occurred.  Mediator shall make this determination within 72 hours of being contacted by Plaintiffs and shall, time permit, allow Defendants to contest the same.

7.  Plaintiff will submit the BOA Judgment to the respective garnishees for execution and completion. Defendants agree that Plaintiffs are entitled to receive any monies held or owed to Defendants by Rise Soufflé Holdings, LLC, or Bank of America, N.A., including, but not limited to any monies on deposit with Bank of America, N.A. or that become due to Defendants by virtue of the Redemption Agreement or the subject matter of the Redemption Agreement. Should counsel for either of the garnishees require a change to the form of the BOA Judgment or Rise Assignment, Defendants agree to execute a substitute judgment of garnishment within five (5) days of receiving email notice of such requested change directed to Defendants' counsel at hopkins@druckerhopkins.com. Any monies received by Plaintiffs pursuant to either the BOA Judgment or Rise Assignment shall be in addition to the Settlement Payments, not in satisfaction of said Settlement Payments.

8.  Counsel for Plaintiffs will hold the Receivership Order in its file and shall not file the Receivership Order with the Court so long as no Defendants are in default of this Agreement. Should any Defendant become in default of this Agreement, Plaintiffs may then file the Receivership Order with the Court and seek to enforce said Receivership Order by any lawful means. Defendants further agree that, should any Defendant become in default of this Agreement Plaintiffs would likewise be entitled to the entry of an order appointing a receiver in each forum or state where Plaintiffs domesticated the Agreed Judgment. Defendants explicitly consent to and agree not to challenge entry of these additional receivership orders pursuant to any and all Domesticated Judgments. Defendants further agree that any such receivership order entered in a foreign state or forum shall be in substantially the same form as the Receivership Order, subject to changes for procedural requisites of the subject forum or state.

9.  Subject to, upon final payment of all sums required to be paid by this Agreement, and conditioned upon Defendants' compliance with Paragraphs 3, 4, and 5 and in exchange for the Settlement Payments and other consideration set forth herein, Plaintiffs release and forever discharge Defendants, their affiliates, successors, partners, general partners, limited partners, assigns, representatives, attorneys, officers, directors, employees, agents, parents and/or subsidiaries, insurers, and reinsurers, of and from any and all liability for any and all claims, demands, and causes of action, whether asserted or unasserted, known or unknown, arising or growing out of the facts forming the basis of the Lawsuit, including, but not limited to, all related economic and other damages, pre-judgment and post-judgment interest, attorneys' fees and costs for prosecuting same.

a.  This release shall not become enforceable or effective until the full amount of all funds due under this Agreement is paid to Plaintiffs.

b.  Upon receipt of all Settlement Payments and the completion of all other terms of this Agreement by Defendants, as described herein, Plaintiffs shall file a nonsuit

with prejudice of all claims asserted in the Lawsuit and destroy the original Stipulated Agreed Judgment attached hereto as Exhibit C, as well as the original Agreed Order Granting Movants' Application for Turnover & Appointment of Receiver.

c. Defendants recognize that Plaintiffs shall have no further interest in OpportunIP. As such, Defendants agree to hold harmless, release, and indemnify Plaintiffs for all claims made against OpportunIP for all legal violations, conduct, actions, agreements, statements, representations, and alleged fraud, if any, that have been or may be made against OpportunIP presently or in the future, regardless of whether such all legal violations, conduct, actions, agreements, statements, representations, and alleged fraud occurred during Plaintiffs' involvement with or ownership in OpportunIP. This release, hold harmless, and indemnification obligation requires Defendants to (a) pay the attorney's fees (or Plaintiffs' chosen separate counsel) as such fees are incurred; (b) pay all litigation expenses and court costs, including expert and travel expenses as they are incurred by Plaintiffs or their counsel; (c) pay all judgments, civil liability, legal findings, damages, penalties, and fines as they are assessed against Plaintiffs; and (d) represent to all entities, persons, agencies, or legal authorities that Plaintiffs have had no involvement in any legal violations, conduct, actions, agreements, statements, representations, and alleged fraud.

10. In exchange for Plaintiffs' settlement and compromise, Defendants release and forever discharge Plaintiffs, and their affiliates, successors, partners, general partners, limited partners, assigns, representatives, attorneys, officers, directors, employees, agents, parents and/or subsidiaries, insurers, and reinsurers, of and from any and all liability for any and all claims, demands, and causes of action, whether asserted or unasserted, known or unknown, arising or growing out of the facts forming the basis of the Lawsuit, including, but not limited to, all related economic and other damages, pre-judgment and post-judgment interest, attorneys' fees and costs for prosecuting same. Defendants specifically agree that all contracts between Plaintiffs and Defendants, as well as any affiliation, (actual and implied) joint-venture, company, partnership, corporation, or any other alleged legal arrangements or agreements between the parties are terminated, unenforceable, and no longer valid. Defendants stipulate that Plaintiffs owe no obligations or duties to Defendants, except as set forth in this Agreement.

11. By executing the Deed of Trust, the parties intend the property commonly known as 541 Westover Road, Stamford, CT 06902 ("Connecticut Property"), to be utilized as security for the obligations contained within this Agreement. To the extent that the Deed of Trust is insufficient to grant to ████████████████ the property interest in the Connecticut Property contemplated by this Agreement, the parties agree to execute any and all documents that may be necessary to properly secured such obligations and perfect such lien in accordance with Connecticut Law. Defendants shall execute such documents as required and return them to Plaintiffs' counsel within five (5) days of receiving email notice of such requested documents.

12. Defendants shall provide Plaintiffs with a list of all real estate properties owned by Defendants, ~~their family members~~, or their affiliates or in which Defendants have any

ok

ownership interest, to the extent such properties (or Defendants' interest therein) shall be sold to fund any portion of the amounts owed under the terms of this Agreement. Defendants shall provide the physical address, street address, estimated property values, all owners' full names, *of* and all entity names that hold an ownership or security interest in such properties. This list of properties shall be provided by Defendants to Plaintiffs within five (5) days of the execution of this Agreement. Failure to provide this list to Plaintiffs' counsel within five (5) days of the execution of this Agreement shall constitute a material default of this Agreement. *Plaintiffs will not, and agree not to, contact Defendants' family members, affiliates, or entities*

13.     Except as compelled by a subpoena issued by a court of competent jurisdiction or required by government or law enforcement agency, Plaintiffs and Defendants agree that the terms of this Agreement shall be confidential and shall not be disclosed to any third party so long as all amounts owed by Defendants to Plaintiffs pursuant to the terms of this Agreement are paid in full and all obligations owned by Defendants to Plaintiffs pursuant to the terms of this Agreement are fully performed. If Defendants default under any term of this Agreement, fail to pay any amount in full in accordance with the terms of this Agreement, or fail to perform all obligations under this Agreement, this confidentiality obligation shall be unenforceable and no longer valid. Notwithstanding this obligation, Plaintiffs may report the payments made by Defendants to Plaintiffs to the IRS and characterize such payments in any manner.

14.     Time is of the essence with respect to all deadlines set forth in this Agreement.

15.     Except as provided herein, this Agreement shall supersede and merge all prior understandings, oral or otherwise, among the Settling Parties arising out of the negotiations relating to this Agreement, and may not be changed orally, but only in a written amendment signed by the Settling Parties hereto. The Settling Parties agree to execute any and all other documents that may be necessary or appropriate to effectuate the terms and intent of this Agreement.

16.     The Settling Parties agree that if any attorneys' fees or expenses are incurred in connection with any Settling Party seeking enforcement of this Agreement or any of its terms, or in connection with any Settling Party seeking damages for any breach hereunder, the Settling Party bearing such attorneys' fees and expenses shall be entitled to recover the same from any other Settling Party found to be in breach of the terms of this Agreement.

17.     In the event that one or more provisions of this Agreement shall be declared to be invalid, illegal, or unenforceable in any respect, unless such invalidity, illegality, or unenforceability shall be tantamount to a failure of consideration, the validity, legality, and enforceability of the remaining provisions contained in this Agreement shall not be in any way affected or impaired thereby.

18.     This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. A facsimile signature of a Settling Party to this Agreement shall be binding on such party to the same extent as an original signature.

19.     It is understood and agreed by the Settling Parties that this Agreement shall be construed without regard to any presumption or other rule requiring construction against the Settling Party causing this Agreement to be drafted.

20.     In signing this Agreement, the Settling Parties hereto expressly certify that they have carefully read all provisions contained herein, that they have consulted with legal counsel or have had the opportunity to do so, and they have voluntarily signed this Agreement with the understanding that it will be final and binding as to their interests, and that no Settling Party has relied upon any statement or representation by any other Settling Party, or by any Settling Party representative, in reaching its independent conclusion to enter this Agreement, unless said statement or representation is expressly set forth herein.  This Agreement shall inure to the benefit of the Settling Parties themselves, as well as their respective shareholders, directors, officers, partners, limited partners, agents, employees, attorneys, successors, and assigns.

21.     The Settling Parties agree that this Agreement shall be governed by, construed and enforced in accordance with and subject to the laws of the State of Texas, and venue of any litigation concerning any matters of this Agreement or its performance shall be exclusively in Tarrant County, Texas.

22.     By affixing his or her signature hereto, the corporate officer or other representative of any company or entity executing this Agreement on behalf of any of the Settling Parties represents and warrants that he or she has actual authority to execute this Agreement and to bind the corporation or entity thereby.

IN WITNESS WHEREOF, the Settling Parties hereto do execute this Agreement on the date(s) indicated below.

*Henning Family Partnership*

By: _Steven L. Henning_

Its: _Managing Member_

Date: _8/4/17_

*Steven L. Henning*

By: Steven L. Henning

Date: _8/4/17_

*Ann Henning*

By: Ann Henning

Date: _8/4/17_

~~CBS Consolidates, LLC~~

~~By: Court D. Smith~~

Its: _Manager_

Date: _8/4/2017_

~~ABL Lab, LLC~~

~~By: Anthony Scotti~~

Its: _Manager_

Date: _8/4/17_

VICTIM 1

~~Anthony Scotti~~

~~By: Anthony Scotti~~

Date: _8/4/17_

## Assignment of Promissory Note

This Assignment of Promissory Note is made effective as of this 4th day of August, 2017 by and between ▓▓▓▓▓▓▓▓ ("**Assignor**") and ▓▓▓▓▓▓▓▓▓▓▓ ("**Assignee**").

For value received, Assignor hereby assigns and transfers all of the Assignor's right, title and interest in and to, and proceeds from that certain promissory note by and between David Rudich, as Borrower, and ▓▓▓▓▓▓▓, as Lender, dated November 26, 2014 in the original principal amount of FIVE HUNDRED THOUSAND DOLLARS AND 00/100 ($500,000.00) to Assignee.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Agreement as of the day and year first above written.

**Assignor:**

**AIS Holdings, LLC**

By: Steven L. Henning
Its:  Manager

**Assignee:**



Its:  Manager

Exhibit A

## Assignment and Assumption Agreement

This Assignment and Assumption of Membership Interest (this "**Agreement**") is made effective as of this 4th day of August, 2017 by and between Ann Henning ("**Assignor**") and ~~████████████~~ ("**Assignee**").

### RECITALS

WHEREAS, Assignor currently owns a 291.54518 preferred units (the "Membership Interest") in Rise Soufflé Holdings, LLC, a Texas limited liability company (the "Company"); and

NOW THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. On the terms and conditions hereinafter set forth, Assignor hereby grants, conveys, assigns and transfers to Assignee (collectively, the "Assignment") all of Assignor's right, title and interest, in, to and under the Membership Interest and proceeds therefrom (the "Assigned Interest").

2. Assignee hereby accepts the Assignment and Assignee assumes the obligations of Assignor with respect to the Membership Interest accruing after the date hereof.

3. Effective as of the Effective Date, Assignee hereby assumes all of the duties, obligations and liabilities of Assignor relating to the Membership Interests except that Assignee is not assuming and under no circumstance shall Assignee be obligated to pay or assume, and none of the Membership Interest shall be or become liable for or subject to, any liability of Assignor, whether known or unknown, fixed or contingent, recorded or unrecorded including, without limitation, any liabilities.

Exhibit B

4. Upon the execution of this Assignment by the parties hereto, Assignor does hereby withdraw as a member of the Company.

5. The parties hereto agree that this Agreement shall bind and inure to the benefit of the Assignee and its respective heirs, executors, administrators, successors and assigns.

6. Nothing in this Agreement is intended to modify, amend, or alter in any respect the any other rights or obligations of the parties.

7. Both Assignor and Assignee agree to take or cause to be taken such further action to execute, deliver and file or cause to be executed, delivered and filed, such further documents and instruments, and to obtain such further consents, as may be necessary or as may be reasonably requested in order to effectuate fully the purposes, terms and conditions of this Agreement.

8. This Agreement shall be construed under and enforced in accordance with the laws of the State of Texas.

9. Any modification of this Agreement shall be effective only if in a writing executed by all parties.

10. This Agreement may be executed in counterparts, each of which shall be an original and all of which, taken together, shall constitute one and the same instrument.

(SIGNATURE PAGE TO FOLLOW)

IN WITNESS WHEREOF, Assignor and Assignee have executed this Agreement as of the day and year first above written.

**Assignor:**

**Ann Henning**

By: Ann Henning

**Assignee:**

SBS Consolidated, LLC

By: Court S. Smith

Its: _Manager_

Cause No. 096-291731-17



|  |  |
|---|---|
| ████████████████████████ | IN THE DISTRICT COURT |
| VS. | |
| ████████████████████████ | 96th JUDICIAL DISTRICT |
| VS. | |
| STEVEN L. HENNING, ANN HENNING, AND HENNING FAMILY PARTNERSHIP | TARRANT COUNTY, TEXAS |

## STIPULATED AGREED JUDGMENT

The parties to the above styled lawsuit agreed to enter a Stipulated Agreed Judgment demonstrating the parties' agreement to Plaintiffs' relief with respect to Plaintiffs' claims for fraud, statutory fraud, breach of fiduciary duty, and breach of contract. Steven L. Henning, Ann Henning and the Henning Family Partnership, Defendants herein, have agreed, that Plaintiff is entitled to the entry of this Agreed Judgment.

The Court finds that pursuant to the agreement of the parties, this Stipulated Agreed Judgment should be entered in this cause.

**IT IS THEREFORE, ORDERED, ADJUDGED** and **DECREED** that Plaintiffs ████ VICTIM 1 ████████████████████████████ have judgment against Defendants Steven L. Henning, Ann Henning and the Henning Family Partnership, jointly and severally, in the sum of $3,000,000.00; prejudgment interest at the statutory rate of 6% per annum from April 25, 2017, through entry of judgment; post-judgment interest at the rate of 5% per annum from the date of judgment, together with a reasonable and necessary attorney's fee in the sum of $25,000.00, together with conditional attorney's fees, with interest thereon at the rate of 5% per annum from date of

Exhibit C

judgment, and with its costs in their behalf expended and that it have its execution.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all writs and processes necessary to collect and enforce this judgment against Defendants shall issue in favor of Plaintiffs.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Agreed Judgment finally disposes of all claims and all parties and is appealable.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all relief not specifically granted herein is denied.

SIGNED this the_____day of_____2017.


_____

*JUDGE PRESIDING*

AGREED:

PADFIELD & STOUT, L.L.P.
421 W. 3rd Street, Suite 910
Fort Worth, Texas 76102
817-338-1616  phone
817-338-1610  fax

/s/ Mark W. Stout
Mark W. Stout
State Bar I.D. # 24008096
ms@livepad.com
Matthew D. Giadrosich
State Bar I.D. # 24074274
mdg@livepad.com
*Attorneys for Plaintiffs*

DRUCKER | HOPKINS, LLP
8505 Technology Forest Place, Suite 901
The Woodlands, Texas 77381
Telephone: 281.210.0041
Facsimile: 855.558.1745

Kirby D. Hopkins
Texas Bar No. 24033448
Douglas R. Drucker
Texas Bar No. 06136100
hopkins@druckerhopkins.com
trials@druckerhopkins.com
*Attorneys for Defendants*

<u>Deed of Trust</u>

**Terms**

Date:   August __, 2017

Grantor:     Steven Henning and Ann Henning

Grantor's Mailing Address:   541 Westover Road
                             Stamford, CT 06902-1314

Trustee:    Mark W. Stout, Padfield & Stout, LLP

Trustee's Mailing Address:   421 W. Third Street, Suite 910
                             Fort Worth, Texas 76102

Beneficiary:   ▮▮▮▮▮▮▮▮▮▮▮

Beneficiary's Mailing Address:   ▮▮▮▮ Legacy Drive, Suite ▮▮▮▮
                                 Frisco, Texas 75034

**Obligations of Steven and Ann Henning to ▮▮▮ Consolidated, LLC ("Obligation")**

Obligation:

All amounts due and owing under that certain Settlement and Release Agreement entered into between Grantor and Beneficiary as of the _____ day of August 2017.

Property (including any improvements):

   541 Westover Road, Stamford, CT 06902, further described on **Exhibit A**.

Other Exceptions to Conveyance and Warranty:

For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Beneficiary will release it at Grantor's expense.

**Clauses and Covenants**

A.      **Grantor's Obligations**

        Grantor agrees to—

        1.      keep the Property in good repair and condition;

Exhibit D

2.    pay all taxes and assessments on the Property before delinquency;

3.    defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4.    maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Beneficiary reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Beneficiary, and deliver evidence of the Required Insurance Coverages in a form acceptable to Beneficiary at least ten days before the expiration of the Required Insurance Coverages;

5.    obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.    keep any buildings occupied as required by the Required Insurance Coverages;

7.    if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments;  ~~and~~

~~8.    refrain from using the Property as Grantor's primary residence until Grantor's Obligation under the Promissory Note has been fully satisfied; and~~

9.    notify Beneficiary of any change of address.

**B.    Beneficiary's Rights**

1.    Beneficiary or Beneficiary's mortgage servicer may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2.    If the proceeds of the Obligation are used to pay any debt secured by prior liens, Beneficiary is subrogated to all the rights and liens of the holders of any debt so paid.

3.    Beneficiary may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligations or to repair or replace damaged or destroyed improvements covered by the policy.

4.    If Grantor fails to perform any of Grantor's obligations, Beneficiary may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

5.    If there is a default on the Obligations or if Grantor fails to perform any of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Beneficiary may—

    a.      declare the unpaid principal balance and earned interest on the Obligations immediately due;

    b.      direct Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent will cause notice of the foreclosure sale to be given as as required by the laws of Connecticut as then in effect; and

    c.      purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligations.

Notwithstanding any other paragraph, the Trustee may foreclose upon any individual property referenced in Exhibit B or may choose to foreclose upon all property listed in Exhibit B.

6.      Beneficiary may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**C.    Trustee's Rights and Duties**

If directed by Beneficiary to foreclose this lien, Trustee will—

1.      either personally or by agent give notice of the foreclosure sale as required by the laws of Connecticut as then in effect;

2.      sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.      from the proceeds of the sale, pay, in this order—

    a.      expenses of foreclosure, including a reasonable commission to Trustee;

    b.      to Beneficiary, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c.      any amounts required by law to be paid before payment to Grantor; and

    d.      to Grantor, any balance; and

4.      be indemnified, held harmless, and defended by Beneficiary against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**D.    General Provisions**

1. If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2. Recitals in any trustee's deed conveying the Property will be presumed to be true.

3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4. This lien will remain superior to liens later created even if the time of payment of all or part of the Obligations are extended or part of the Property is released.

5. If any portion of the Obligations cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6. Grantor assigns to Beneficiary all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Beneficiary will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligations. Beneficiary will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Beneficiary notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7. Grantor assign to Beneficiary absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Beneficiary's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligations or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Obligations and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligations and the deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Obligations or performance of this deed of trust, Beneficiary may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Beneficiary may exercise Beneficiary's rights and remedies under this paragraph without taking possession of the Property. Beneficiary will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Beneficiary's rights and remedies and then to Grantor's obligations with respect to the Obligations and this deed of trust in the order determined by Beneficiary. Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Beneficiary's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Connecticut law.

8. Interest on the debt secured by this deed of trust will not exceed the maximum amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received

under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.    In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.    Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Beneficiary. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Beneficiary; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Beneficiary may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

11.    Grantor may not cause or permit any Property to be encumbered by any liens, security interests, or encumbrances other than the liens securing the Obligations and the liens securing ad valorem taxes not yet due and payable without the prior written consent of Beneficiary. If granted, consent may be conditioned upon Grantor executing, before granting such lien, a written modification agreement containing any terms Beneficiary may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

12.    Grantor may not grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering the Property that is subordinate to the liens created by this deed of trust without the prior written consent of Beneficiary. If granted, consent may be conditioned upon the Subordinate Instrument's containing express covenants to the effect that—

(a)    the Subordinate Instrument is unconditionally subordinate to this deed of trust;

(b)    if any action is instituted to foreclose or otherwise enforce the Subordinate Instrument, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Beneficiary, and that consent, if granted, may be conditioned in any manner Beneficiary determines;

(c)    rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Obligations then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Beneficiary may determine, before being applied to any indebtedness secured by the

Subordinate Instrument;

(d)     written notice of default under the Subordinate Instrument and written notice of the commencement of any action to foreclose or otherwise enforce the Subordinate Instrument must be given to Beneficiary concurrently with or immediately after the occurrence of any such default or commencement; and

(e)     in the event of the bankruptcy of any Grantor, all amounts due on or with respect to the Obligations and this deed of trust will be payable in full before any payments on the indebtedness secured by the Subordinate Instrument.

13.     Grantor may not cause or permit any of the following events to occur without the prior written consent of Beneficiary: if Grantor is (a) a corporation, the dissolution of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the dissolution of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the dissolution of the partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint venturer; or (d) a limited partnership, (1) the dissolution of the partnership, (2) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (3) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (4) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Beneficiary; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Beneficiary may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

14.     When the context requires, singular nouns and pronouns include the plural.

15.     The term Obligations includes all extensions, modifications, and renewals of the Obligations and all amounts secured by this deed of trust.

16.     This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

17.     If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower(s).

18.     Grantor and each surety, endorser, and guarantor of the Obligations waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

19.     Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Beneficiary's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

20.     If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

21.     The term *Beneficiary* includes any mortgage servicer for Beneficiary.

22.     Grantor represents that this Deed of Trust is given for the following purposes:  To secure Beneficiary's payment under the Promissory Note ~~attached as Exhibit A.~~ and/or Settlement Agreement.

STEVEN HENNING

By:     Steven L. Henning, Individually

ANN HENNING

By:     Ann Henning, Individually

THE STATE OF _____ §
                              §
COUNTY OF _____       §

     BEFORE ME, a Notary Public for said County and State, the undersigned authority, on this day personally appeared Steven L. Henning, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of August 2017.

_____

                          NOTARY PUBLIC, STATE OF TEXAS

THE STATE OF _____ §
                              §
COUNTY OF _____       §

     BEFORE ME, a Notary Public for said County and State, the undersigned authority, on this day personally appeared Ann Henning, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of August 2017.

_____

                          NOTARY PUBLIC, STATE OF TEXAS

Exhibit A

LEGAL DESCRIPTION FOR PROPERTY

Cause No. 096-291731-17



| | | |
|---|---|---|
| ████ CONSOLIDATED, LLC, ABL LAB, LLC, AND ANTHONY D SCOTT) | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | |
| ████ BANK OF AMERICA, N.A., RISE SOUFFLE' HOLDINGS, LLC, AND JANUS CAPITAL GROUP, INC. | § | 96th JUDICIAL DISTRICT |
| | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| STEVEN L. HENNING, ANN HENNING, AND HENNING FAMILY PARTNERSHIP | § | TARRANT COUNTY, TEXAS |

---

**AGREED ORDER GRANTING MOVANTS' APPLICATION**
**FOR TURNOVER & APPOINTMENT OF A RECEIVER**

---

On this date came on to be heard Movants' Application For Turnover And Appointment of a Receiver ("Application") filed herein by Movants, ████ Consolidated, LLC, ABL Lab, LLC, and Anthony Scott ("Movants") following entry of Judgment, and after reviewing the Application, the papers on file, and the evidence herein, the Court finds that Movants are the owners and holders of a Judgment against Judgment Debtors Steven L. Henning, Ann Henning and the Henning Family Partnership, which was signed by this Court on _____ (the "Judgment") and was in the amount of $3,000,000.00 with pre-judgment interest at the rate of six percent (6%) per annum from April 25, 2017, post-judgment interest on the total amount at the rate of five percent (5%) per annum, and attorney's fees and expenses incurred in the amount of $25,000.00. Judgment Debtors have not made timely payments due as credit against the Judgment, and Movants have good faith reason to believe that Judgment Debtors owns non-exempt rights to present or future property, such as bank accounts that are easily moved and constantly changing in balance and shares of stock in corporations, membership units in limited liability companies and partnership interests. The Court finds that the appointment of a Receiver to locate, marshal, and administer assets is justified because the Court is of the opinion that non-exempt assets exist.

IT IS THEREFORE ORDERED that Stanley W. Wright, whose address is 2324 Rogers Ave., Fort Worth, TX 76109 (telephone: (817) 455-8683; fax: (206) 203-4716; email stan-wright@sbcglobal.net) be, and he hereby is, appointed Receiver pursuant to the Texas Turnover Statute with authority to take possession of and sell the assets of Judgment Debtors. For the purposes of this order, assets of Judgment Debtors shall include all community property interest in any property owned jointly with the Judgment Debtors' spouse(s). Judgment Debtors are ordered to comply with this Order and to fully cooperate with the Receiver to complete his

---

Exhibit F

duties, including preparing and signing all documents needed to recover, seize, and sell property, and is further ordered to timely prepare or cause to be prepared all Federal Income Tax Returns and other tax returns and timely deliver copies to the receiver. Judgment Debtors are enjoined from transferring or encumbering any non-exempt property owned by Judgment Debtors to anyone but the Receiver and from concealing property, including  through the use of third parties, e.g., relatives, trusts, attorneys, companies, agents, assumed names, pseudonyms or any other means. Cooperation with the Receiver is to continue on an on-going basis until the judgment is paid or otherwise settled. The Receiver is an agent of this Court, and is to be treated with the same courtesy accorded to the Court. The terms of the Receiver's appointment and duties are as follows:

1.  **Receiver's Powers:** The Receiver shall have the authority to take possession of all non-exempt property of Judgment Debtors whether in the Judgment Debtors' possession or is subject to the Judgment Debtors' control, including, but not limited to the following: (a) all documents or records, including financial records, related to such property that is in the actual or constructive possession or control of Judgment Debtors; (b) all cash, all financial accounts including but not limited to bank accounts, certificates of deposit, money market accounts, accounts held by any third party; (c) all securities; (d) all real property and personal property including boats, airplanes, motor vehicles, and trailers; (e) all safety deposit boxes; (f) all cash of any nature including gifts or payments made on behalf of Judgment Debtors, whether in the Judgment Debtors' possession or is subject to Judgment Debtors' control; (g) all negotiable instruments, including promissory notes, drafts, and checks; (h) causes of action or choses of action; (i) contract rights, whether present or future; and (j) accounts receivable, of every nature, type, and description. All such property, shall be held in *custodia legis* of said Receiver as of the date of this Order. An Order from the Receiver, made pursuant to this Order, is equivalent to an Order from this Court. All portions of this Order are to continue until the judgment is paid.

2.  **Additional Powers:** The Receiver shall have the following additional rights, authority and powers with respect to Judgment Debtors and their property, to (a) collect all accounts receivable of Judgment Debtors; (b) change locks at all premises at which any property is situated; (c) open all mail directed Judgment Debtors or any business of Judgment Debtors, and to have Judgment Debtors' mail forwarded to the address of the Receiver; (d) obtain Judgment Debtors' federal income tax returns, which Judgment Debtors shall be required to timely prepare and present annually to the Receiver,  credit information, and credit reports; (e) endorse and cash all checks and negotiable instruments payable to Judgment Debtors; (f) sell or lease any real property or mineral interest of Judgment Debtors; (g) hire any person or company to move and store property of Judgment Debtors; (h) obtain from any financial institution, bank, credit union or savings and loan any financial records belonging to or pertaining to Judgment Debtors; (i) obtain from any landlord, building owner, or building manager where Judgment Debtors or Judgment Debtors' business is a tenant, copies of Judgment Debtors' lease, lease application, credit application, payment history, and copies of Judgment Debtors' checks for rent or other payments; (j) hire any person or company necessary to accomplish any right or power under this order; (k) take all action necessary to gain access to storage facilities, safety deposit boxes, real property, and leased premises wherein any property of Judgment Debtors may be situated, and to obtain copies of all documents related to the same; (l) file IRS Form 56, Notice Concerning Fiduciary

Relationship, and require Judgment Debtors to comply with all of his responsibilities to prepare and file timely tax returns, and it is specifically provided that the Receiver shall have no responsibility for the accuracy or timely filing of any tax return; (m) obtain and use Judgment Debtors' credit reports; (n) schedule hearings and meetings and directing parties and witnesses to give testimony and to rule upon the admissibility of evidence at such hearings; and (o) place witnesses under oath and examining them himself or through his agents. The Receiver has no duty to protect the Judgment Debtors or his property from loss or anything else. Additionally, the Receiver has the following powers over internet sites, domains, telephones, etc.:

a.   Passwords, PINs, and Keys. Judgment Debtors are ordered to deliver to the Receiver, within five days of receipt of a copy of this order, a copy of all keys, and a list of all personal identification numbers (PINs), passwords, and combinations, with a clear list explaining what each key, PIN, etc. opens, where to locate the items to which the keys, PINs, etc. are related, and what is contained in the items to which the keys, PINs, etc. are associated. Only the Receiver may change keys and codes. No key, password, PIN, etc. may be changed without the Receiver's prior written consent.

b.   Telephone numbers. The Receiver is authorized to redirect, lease, or sell all telephone numbers belonging to any Judgment Debtors.

c.   Websites. The Receiver is authorized to seize, monitor, close, lease, renegotiate, or sell all websites, domain names, and e-mail addresses which Judgment Debtors own or control, including all derivations of the names and addresses ("domain names"), for cash or by purchase money note or in any other manner deemed acceptable by the Receiver in his sole discretion, for prices deemed to be reasonable by Receiver, and on terms and conditions deemed to be reasonable by Receiver and subject to all liens.

3.   **Officers to Assist Receiver:**  Any Sheriff, Constable, Texas Peace Officers, and their deputies, are hereby directed and ordered to assist the Receiver in carrying out his duties and exercising his powers hereunder and prevent any person from interfering with the Receiver in taking control and possession of the property of Judgment Debtors.

4.   **Receiver's Fee and Bond:**  The Receiver is ordered to post bond in the amount of $100.00 payable to this Court and conditioned upon the faithful discharge of his duties in accordance with this Order. The Receiver's fee, which shall be an amount equal to 20% of all amounts collected by the Receiver or $2,500.00 (whichever is greater), is taxed as costs against the Judgment Debtors. The Receiver is ordered to take his oath of office.

5.   **Turnover of Property and Documents to Receiver:**  Judgment Debtors and third parties in possession of property of the Judgment Debtors are ordered to immediately turnover to the Receiver, within five (5) days of being served with a copy of this order, all documents documents described in the attached **Exhibit "A."** Judgment Debtors and third parties in possession of property of the Judgment Debtors are ordered, until the judgment in this case is fully paid, to turnover to the Receiver at the Receiver's address all of Judgment Debtors' checks, cash of any nature including gifts or payments made on behalf of

Judgment Debtors, whether in the Judgment Debtors' possession or is subject to Judgment Debtors' control, securities, promissory notes, documents of title, and contracts within three (3) days of receipt of such property. All financial institutions shall provide to the Receiver all information that is requested by the Receiver and known to the financial institution, including, without limit, the existence and location of Judgment Debtors' whereabouts, bank accounts, loans, and credit card information. This Order specifically serves as the Court Order required by 47 U.S.C. § 551, and satisfies all obligations of the responding party to obtain or receive a Court Order prior to disclosing material containing personally identifiable information of the subscriber and/or customer. Upon service of a confirmed copy of the Order of Receivership in the manner specified by TEX. FIN. CODE § 59.008, Property held by a financial institution in the name of or on behalf of the Judgment Debtors as customer of the financial institution, shall be turned over to the Receiver.

6.   **Disbursement of Property:**   The Receiver may, without further order of the Court, pay himself the fee specified in Paragraph 4 above, together with the reimbursement of any actual out of pocket expenses incurred in the administration of this Order as funds become available. The Receiver may, without further order of the Court pay his attorney and other persons employed to assist the Receiver in the administration of this Order. The Receiver is authorized and directed to pay all additional amounts to Movant in this cause, by and through its attorney of record, and may do so without further order of this Court. All of the Receiver's cost and expenses incurred in the administration of this Order shall be taxed against the Judgment Debtors.

7.   **Subpoenas of Third Parties and Deposition of Judgment Debtors.**  The Receiver is hereby authorized to issue subpoenas to third parties to obtain production of any documents or other tangible things that relate or pertain to any property owned by the Judgment Debtors.  The Receiver is further authorized to notice at any time the oral deposition of the Judgment Debtors and other parties to determine whether the Judgment Debtors own any property. The method for noticing a deposition of the Judgment Debtors and other parties shall be pursuant to the Texas Rules of Civil Procedure.

8.   **Service and Notice:** Judgment Debtors are ordered within three (3) days of date of this order to provide Receiver with a current facsimile number and/or e-mail address for service by electronic delivery of any required notice(s) and/or written communication(s). Judgment Debtors shall have the affirmative duties to maintain and monitor said facsimile number and e-mail address throughout the pendency of this receivership, and to timely respond, within three (3) days to any to any email and/or facsimile sent by the Receiver and/or Movant to the Judgment Debtors at such facsimile and/or email address. Service of any required notice(s) shall be complete upon proof of delivery by facsimile and/or email, and should Judgment Debtors fail to maintain and/or monitor said facsimile and/or e-mail account during the pendency of this receivership, Judgment Debtors shall be deemed to have been properly served and noticed upon the Receiver and/or Movant's certification of delivery of same by regular mail.

SIGNED this the _____ day of _____, 201_.


_____
*JUDGE PRESIDING*


AGREED:

PADFIELD & STOUT, L.L.P.
421 W. 3rd Street, Suite 910
Fort Worth, Texas 76102
817-338-1616  phone
817-338-1610  fax

/s/ Mark W. Stout
Mark W. Stout
State Bar I.D. # 24008096
ms@livepad.com
Matthew D. Giadrosich
State Bar I.D. # 24074274
mdg@livepad.com
*Attorneys for Plaintiffs*

DRUCKER | HOPKINS, LLP
8505 Technology Forest Place, Suite 901
The Woodlands, Texas 77381
Telephone: 281.210.0041
Facsimile: 855.558.1745

Kirby D. Hopkins
Texas Bar No. 24034418
Douglas R. Drucker
Texas Bar No. 06136100
hopkins@druckerhopkins.com
trials@druckerhopkins.com
*Attorneys for Defendants*

<u>EXHIBIT A</u>

DOCUMENTS TO BE DELIVERED WITHIN FIVE DAYS PURSUANT TO
THE ORDER GRANTING TURNOVER AND APPOINTING RECEIVER

Unless otherwise stated, all time periods are for the three (3) years before this order was signed. "Respondent" includes Judgment Debtors and Judgment Debtors' spouse(s), within three (3) years of the signing of the order. "Records" and "documents" are mutually inclusive. All requests regarding property or records and documents owned, possessed, prepared, or received by Respondent also applies to Respondent's spouse, ex-spouse, brother sister, child, step-child, mother, father, sister, brother, partner, or co-shareholder in a small business. Any use of the term "produce," means to deliver.

The following items are to be delivered to the Receiver by Judgment Debtors at the Receiver's office, within five (5) days of receipt of this Order by Judgment Debtors:

1.   All checks, cash, accounts at financial institutions, securities (stocks and bonds), promissory notes, documents of title, deeds, and contracts owned by or in the name of Judgment Debtors or subject to the Judgment Debtors' control;

2.   Legible copies of all personal and business federal income tax returns filed by or prepared for Respondent, together with all schedules, attachments, W-2 forms, 1099 forms and all similar federal income summary forms;

3.   All statements, canceled checks and deposit slips for all checking accounts, savings accounts, credit union accounts or other depository accounts, held either separately or jointly, for all accounts in which Respondent's name is on the printed checks, in which Respondent has an interest and/or in which Respondent has signatory authority. This includes all trust accounts on which the Respondent may sign;

4.   A copy of the witness' driver's license, social security card, and other items used to identify the witness, like an identification card issued by the Texas Department of Public Service or Department of Public Safety;

5.   Copies of all financial statements prepared by or on behalf of Respondent, including all such statements presented to any financial institution and/or any other party for the purpose of guaranteeing, securing or attempting to secure a loan or financial assistance of any kind;

6.   All booklets, current and annual statements and all other documents evidencing the nature and extent of Respondent's rights under any stock option plan, retirement plan, pension or profit sharing plan, employee stock ownership plan, company savings plan, thrift fund matching plan, and all other similar plans;

7.   The most recent statements, deposit confirmation slips, documents evidencing the balance, term and interest rates for every amount of money and assets in which Respondent has any interest, whether separately or jointly, invested by or for the Respondent in cash management funds, certificates of deposit, money market funds,

706bc36a036a99f6

treasury bills, bonds, debentures or other type investment and acquisition paying or promising to pay a return on Respondent's monies invested;

8.  All certificates of stock or brokerage house statements evidencing all ownership and every purchase, sale, assignment or transfer of stocks, bonds, debentures and/or other securities (whether in privately held or publicly traded companies or institutions) owned by Respondent or in which Respondent has a beneficial interest;

9.  All documents and records showing all business holdings, partnerships (general, limited or otherwise), sole proprietorships, trusts, corporations, joint ventures and any other business organizations of every kind in which Respondent (including spouse) is a partner or has an interest and assumed name certificates under which Respondent has done or is doing business;

10. All active or inactive policies of insurance, whether life, health, auto, disability, homeowners, personalty or otherwise, of which Respondent is the owner, beneficiary, insured, heir to the proceeds, beneficiary of existing or identified trust funded by insurance proceeds;

11. All deeds, deeds of trust, land installment contracts, contracts for deeds, syndications, real estate investment trusts, partnership agreements, easements, rights of way, leases, rental agreements, documents involving mineral interests, mortgages, notes and closing statements relating to all real property in which any Respondent (including spouse) has or in which Respondent (including spouse) had or has any interest;

12. All certificates of title, firearms, deer stands, ATV's, boats, trailers, and motors, documentation regarding hunting or fishing leases or rights or the rights to time share units or the use of property, tickets to events, like ballet or sporting events, proof of spa or club memberships, current licenses, receipts, bills of sale and loan documents for all motor vehicles and farm equipment, including automobiles, trucks, motorcycles, recreational vehicles, boats, trailers, airplanes and other motorized vehicles and equipment owned by Respondent (including spouse) or in which Respondent (including spouse) has and had any interest;

13. For every trust of which a Judgment Debtors are a trustee, joint trustee, beneficiary, settlor or trustor which conveyed, transferred, assigned, created any options to purchase, or disposed of any interest in real property or personal property in any manner, furnish documents evidencing the manner of disposition and the consideration received or to be received. Furnish all documents showing all evaluations of Respondent's interest, share of principal and income and documents showing the principal and income allocated to Respondent whether or not distributed during the last three (3) years;

14. All documents and records of all safe deposit boxes maintained by Respondent (including spouse) or to which Respondent (including spouse) has had access, or has a claim, right or interest in, including all lists of all contents therein. Identify the location of all the safe deposit boxes and deliver the keys to the Receiver;

15. All documents constituting and describing each Respondent's accounts receivable, whether or not collected. Deliver all documents identifying the accounts receivables of all businesses which Respondent owns and in which Respondent has or had any interest, and a copy of all collected, offset, credited, uncollected, discounted, assigned, pledged and exchanged accounts receivables;

16. All copies of every appraisal of real estate or personal property in which Respondent or Respondent's spouse has or had any interest;

17. Every inventory or list of real or personal property, application for credit been made by Respondent or spouse, including all estimates of value placed on each item;

18. Deliver all mail, unopened, as it is received;

19. All documents, notes, bills, statements and invoices evidencing all current indebtedness payable by Respondent or paid off by respondent, and all assignments of promissory notes made by Respondent;

20. All lease agreements for personal property and real property executed by Respondent, whether as lessee, lessor, sublessee, sublessor, assignee or assignor, including any mineral interest leases;

21. Deliver records of all travelers checks, cashier's checks, money orders, drafts and draws that were received, cashed or purchased;

22. Deliver the names, addresses and telephone numbers of all organizations and persons within Respondent's knowledge who has or may have knowledge of the status of property in which Respondent has and had an interest, whether being community or separate property, the Respondent's liabilities and the location and value of Respondent's assets. This includes banks,savings and loan associations, mortgagees, merchants, credit providers, brokers, credit unions, financial institutions, security dealers, people and organizations dealing with mineral interests who have received information from Respondent regarding or including information about Respondent's assets and interests, income, and liabilities;

23. All records that would indicate the cost basis of Respondent's assets;

24. Copies of the current inventory and all past inventories, accounts receivable of all ongoing businesses which Respondent owns and had an interest and copies of all collected, offset, credited, uncollected discounted, assigned, pledged and exchanged accounts receivable of all businesses owned by Respondent and in which Respondent has or had any interest;

25. All contracts in which Respondent is a party or has or had a beneficial interest, including all earnest money contracts, construction contracts, rental or lease contracts and sales agreements in which Respondent is due a commission or other remuneration. If Respondent is presently under the terms of any written employment contract or

agreement or is due any remuneration under any past contract or agreement, furnish a copy of the contract or agreement;

26. All minute books, ledgers, corporate records and resolutions pertaining to Respondent or pertaining to any corporation or business in which Respondent has or had any interest;

27. All documents evidencing every gift, bailment, loan, gratuitous holding, assignment, sale, hypothecation, discounted transfer, transfer into lock box payment, and transfer of Respondent's property of any nature;

28. All records of every kind and character showing all personal property in which Respondent has or had any interest in the State of Texas, the United States of America or any other place;

29. All the articles of incorporation, minute books, partnership agreements and assumed name records of all companies, partnerships, corporations and proprietorships that have owners, employees, officers, directors, shareholders and partners which are or were also owners or employees of Respondent;

30. All employment records or pay records to indicate every business for which Respondent was employed, provided services, was an independent contractor, general contractor, superintendent, agent or subcontractor;

31. All checks, cash, securities (stocks and bonds), promissory notes, deeds, deeds of trust, documents of title, contracts, accounts receivable, escrow agreements, retainage agreements, records and all documents that identify all property in which Respondent has an interest and that which is collateral or security for any obligation or contingent obligation of Respondent, along with all documents indicating any interest of the Respondent in rental agreements, royalty agreements, licenses, bailment agreements, filings pursuant to the Uniform Commercial Code security agreements, assignments, all filed or recorded liens, lis pendens, recorded mechanics and materialmen's lien affidavits, judgments, abstracts, partnership agreements, employment agreements, as well as all documents indicating each Judgment Debtors' present and prospective heirship, beneficial interest in trusts, beneficial interest in insurance policies and insurance coverage and right to any insurance policies cash surrender value or ownership in which respondent or respondent's spouse has or had any interest;

32. A copy of the witness' driver's license, social security card, and other items used to identify the witness, such as an identification card issued by the Texas Department of Public Service or Department of Public Safety; and

33. A listing of all air miles and rewards programs, with the last three (3) months' statements.

EXHIBIT "E"  F

Cause No. 096-291731-17



| | | |
|---|---|---|
| ████████████████████ | § | IN THE DISTRICT COURT |
| ████████████████████ | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| ████████████████████ | § | 96th JUDICIAL DISTRICT |
| ████████████████████ | § | |
| ████████████████████ | § | |
| | § | |
| VS. | § | |
| STEVEN L. HENNING, ANN HENNING, | § | |
| AND HENNING FAMILY PARTNERSHIP | § | TARRANT COUNTY, TEXAS |

## AGREED JUDGMENT OF GARNISHMENT

On this day came to be heard the above-styled and numbered cause, and it appearing that Garnishee

Bank of America. ("Garnishee Bank") is indebted to Defendants Steven L. Henning, Ann Henning, and the

Henning Family Partnership, in the amount of $8,646.20. Plaintiffs sued Defendants for debt in excess of

$1,000,000.00 in Cause No. 096-291731-17 styled ████████████████████████████████ *Steven L. Henning, Ann Henning, and Henning Family Partnership.* Said debt remains unsatisfied.

Plaintiffs, Defendants and Garnishee Bank of America, have reached an agreed judgment; the Court makes the

following findings and orders:

At the time of service of the Writ of Garnishment, Garnishee Bank had $4,188.62 in deposit(s) at

Garnishee Bank for the account of Defendants, and at the time of filing its Answer, Garnishee Bank had

$8,646.20 in deposit(s) at Garnishee Bank for the account of Defendants (hereinafter referred to as the

"Garnished Funds"). These are the only amounts for which Garnishee Bank may have been indebted

Defendants at the time the Writ was served and upon the filing of Garnishee's Answer to the Writ.

At the time the instant Writ of Garnishment was served upon Garnishee Bank, and at the time of

filing its Answer, Garnishee Bank was in possession of one (1) safe deposit box in the name of Defendants.

Exhibit E

Garnishee Bank had no knowledge of any other person, firm or corporation who has in its possession any effects belonging to Defendants, other than the amounts set out in Finding of the Fact above.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:

1.  Plaintiffs recover against Garnishee Bank of America the sum of Seven Thousand Thirty-One and 20/100 ($7,031.20), such sum to be credited to the debt sued upon in the above-styled and numbered cause; and

2.  Plaintiffs releases all claims to the contents of the safe deposit box held by Garnishee Bank of America in the name of Defendant(s); and

3.  Bank of America recover against judgment Defendant its reasonable and necessary attorney's fees incurred in this proceeding in the amount of $1,615.00; and

4.  The payment of such sums and possession of the contents of such safe deposit box as set forth above shall issue simultaneously to Plaintiffs and Bank of America from the funds and safe deposit box of Defendants currently being held by Garnishee Bank of America from judgment Defendant's account and safe deposit box; and

4.  It is further ordered, adjudged and decreed, that if this Agreed Judgment is set aside, reformed, challenged in any way, or reversed for any reason by any Court of competent jurisdiction, Plaintiffs, agree to, shall and hereby does indemnify Garnishee for any and all sums paid by Garnishee to Plaintiff pursuant to this Agreed Judgment on Garnishment Action and/or shall immediately return such funds to the registry of the Court; and

5.  It is further ordered, adjudged and decreed, that Bank of America is discharged of all liability to judgment Defendant and Plaintiff upon payment of the sums and turnover of property above ordered.

6.  All relief not expressly granted herein is denied; and this judgment finally disposes of all parties and all claims and is appealable. This is meant to be a Final Judgment pursuant to the Texas Supreme Court's decision in *Lehmann v. Har-Con Corp.,* 39 S.W.3d 191 (Tex. 2001).

2

AGREED JUDGMENT

SIGNED this _____ day of _____, 2017.

_____
JUDGE PRESIDING

**APPROVED AND AGREED:**

**PADFIELD & STOUT, L.L.P.**

By: /s/ Mark W. Stout
   Matthew D. Giadrosich
   State Bar No. 24074274
   421 W. 3rd Street, Suite 910
   Fort Worth, TX 76102
   TEL: (817) 338-1616
   FAX: (817) 338-1610

*ATTORNEY FOR PLAINTIFFS*

DRUCKER | HOPKINS, LLP
8505 Technology Forest Place, Suite 901
The Woodlands, Texas 77381
Telephone: 281.210.0041
Facsimile: 855.558.1745

Kirby D. Hopkins
Texas Bar No. 2403448
Douglas R. Drucker
Texas Bar No. 06136100
hopkins@druckerhopkins.com
trials@druckerhopkins.com

*ATTORNEYS FOR DEFENDANTS*

**ADAMS & REESE LLP**

By:_____
   Evan A. Moeller
   State Bar No. 24051067
   1221 McKinney Street, Suite 4400
   Houston, Texas 77010
   TEL: (713) 652-5151
   FAX: (713) 652-5152

*ATTORNEY FOR BANK OF AMERICA, N.A.*

AGREED JUDGMENT

EXHIBIT # 6

## PREFERRED UNIT REDEMPTION AGREEMENT

THIS PREFERRED UNIT REDEMPTION AGREEMENT (this "Agreement") is made and entered into to be effective as of June __, 2017 (the "Effective Date"), by and between Ann C. Henning ("Henning") and Rise Souffle Holdings, LLC, a Texas limited liability company (the "Company").

### W I T N E S S E T H

WHEREAS, Henning owns 291.54518 preferred units in the Company (the "Redeemed Units") and made an initial capital contributions to the Company in the amount of one hundred thousand dollars ($100,000) pursuant to the company agreement of the Company (as amended to date, the "Company Agreement");

WHEREAS, Henning failed to make a required additional capital contribution of one hundred thousand dollars ($100,000) by June 3, 2016 (the "First Failed Contribution");

WHEREAS, under Section 3.2(c) of the Company Agreement, ~~VICTIM 1~~ (the "Contributing Member") advanced funds to the Company to fully cover the First Failed Contribution on September 28, 2016 and elected to treat such funds as a loan to Henning (as a Defaulting Member) bearing interest at 18% per annum (the "Default Loan");

WHEREAS, under Section 3.2(d) of the Company Agreement, the Default Loan, and all accrued and unpaid interest thereon, is secured by a first priority lien on and security interest in Henning's right to amounts paid from the Company;

WHEREAS, also Henning failed to make a required additional capital contribution of one hundred thousand dollars ($100,000) on April 6, 2017 (the "Second Failed Contribution");

WHEREAS, no members of the Company have advanced funds to the Company to fund the Second Failed Contribution;

WHEREAS, under Section 3.2(f) of the Company Agreement, the unfunded portion of the Second Failed Contribution bears interest at the same rate as a Default Loan (i.e., 18% per annum) until paid, and the Company is required to withhold payments of any kind to Henning until such payments are made; and

WHEREAS, Henning desires to sell, and the Company desires to redeem and purchase, the Redeemed Units as provided herein.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, upon the terms and subject to the conditions set forth herein, the parties hereto agree as follows:

1.    Redemption Price.  The purchase price for the Redeemed Units is two hundred thousand dollars ($200,000) (the "Redemption Price") which amount shall be paid by the Company as follows:

a.    Within five (5) business days of the Effective Date, $100,000, plus accrued and unpaid interest on the Default Loan, shall be delivered to or at the direction of the Contributing Member as a repayment in full of the Default Loan.

**Error! Unknown document property name.**

EXHIBIT E

     b.     On the Effective Date, the amount of the accrued and unpaid interest on the First Failed Contribution and the Second Failed Contribution shall be retained by the Company.

     c.     Within five (5) business days of the Effective Date, $200,000, less (i) the amount paid to or at the direction of the Contributing Member under Section 1.a. and (ii) the amount of accrued and unpaid interest on the First Failed Contribution and the Second Failed Contribution under Section 1.b., shall be delivered to Henning.

     2.     <u>Sale and Redemption of Redeemed Units</u>.  In exchange for the Redemption Price and otherwise on the terms and conditions set forth herein, Henning hereby sells, transfers, conveys and assigns to the Company, and the Company hereby redeems and purchases from Henning, the Redeemed Units, including but not limited to, that portion of the right, title and interest of Henning in and to the properties (real and personal), capital, cash flow, preferred return, distributions and profits and losses of the Company, which are allocable to the Redeemed Units.  Concurrently with the effectiveness of the purchase and redemption of the Redeemed Units by the Company, Henning withdraws from the Company as a member and shall have no further rights, obligations or liabilities as a member of, or capital commitments to, the Company or under the Company Agreement.  It is expressly understood that Henning is selling and the Company is redeeming and purchasing Henning's entire interest in the Company (the "Redemption") and that the Redemption is intended to constitute and be treated as a complete termination of Henning's interest in the Company.

     3.     <u>Effective Date</u>.  The sale and redemption herein is effective as of the Effective Date and from and after that date, the Redeemed Units shall be redeemed and cancelled, and Henning shall have no interest in the Redeemed Units or in the Company.

     4.     <u>Representations and Warranties</u>.   Henning hereby represents and warrants to the Company as of the Effective Date, that:

     a.     this Agreement constitutes the valid, legal and binding obligation of Henning, enforceable in accordance with its terms;

     b.     the execution and delivery of this Agreement by Henning will not conflict with, violate or result in the breach of any of the terms and conditions of, or constitute a default under, any contract, agreement, law, order or decree by which Henning or her assets are bound;

     c.     the Redeemed Units are free and clear of any liens, options, warrants, claims (contingent or absolute), demands, causes of action, or other encumbrances of any kind or character (other than any liens or encumbrances of any form arising from the Company Agreement or arising under applicable securities laws); and

     d.     to Henning's knowledge, there are no actions or proceedings pending or threatened involving the Redeemed Units.

     5.     <u>Release</u>.  Henning, for herself and on behalf of each of her affiliates, agents, successors and assigns, estates, heirs, executors and representatives, as applicable (all of the foregoing being collectively referred to as the "Releasing Parties"), hereby voluntarily, completely and unconditionally, to the maximum extent permitted by applicable law, generally release, acquit, waive and forever discharge the Company, its members, managers, officers, employees, agents, representatives, successors and assigns (collectively, the "Released Parties"), from and against any and all liability, causes of action, demands and claims of whatever kind or character (past or present), whether known, suspected or unknown, vicarious, derivative, fixed or contingent, whether arising from breach of contract claims, any tort claims

2

**Error! Unknown document property name.**

EXHIBIT E

      b.     On the Effective Date, the amount of the accrued and unpaid interest on the First Failed Contribution and the Second Failed Contribution shall be retained by the Company.

      c.     Within five (5) business days of the Effective Date, $200,000, less (i) the amount paid to or at the direction of the Contributing Member under Section 1.a. and (ii) the amount of accrued and unpaid interest on the First Failed Contribution and the Second Failed Contribution under Section 1.b., shall be delivered to Henning.

2.     Sale and Redemption of Redeemed Units.  In exchange for the Redemption Price and otherwise on the terms and conditions set forth herein, Henning hereby sells, transfers, conveys and assigns to the Company, and the Company hereby redeems and purchases from Henning, the Redeemed Units, including but not limited to, that portion of the right, title and interest of Henning in and to the properties (real and personal), capital, cash flow, preferred return, distributions and profits and losses of the Company, which are allocable to the Redeemed Units.  Concurrently with the effectiveness of the purchase and redemption of the Redeemed Units by the Company, Henning withdraws from the Company as a member and shall have no further rights, obligations or liabilities as a member of, or capital commitments to, the Company or under the Company Agreement.  It is expressly understood that Henning is selling and the Company is redeeming and purchasing Henning's entire interest in the Company (the "Redemption") and that the Redemption is intended to constitute and be treated as a complete termination of Henning's interest in the Company.

3.     Effective Date.  The sale and redemption herein is effective as of the Effective Date and from and after that date, the Redeemed Units shall be redeemed and cancelled, and Henning shall have no interest in the Redeemed Units or in the Company.

4.     Representations and Warranties.  Henning hereby represents and warrants to the Company as of the Effective Date, that:

      a.     this Agreement constitutes the valid, legal and binding obligation of Henning, enforceable in accordance with its terms;

      b.     the execution and delivery of this Agreement by Henning will not conflict with, violate or result in the breach of any of the terms and conditions of, or constitute a default under, any contract, agreement, law, order or decree by which Henning or her assets are bound;

      c.     the Redeemed Units are free and clear of any liens, options, warrants, claims (contingent or absolute), demands, causes of action, or other encumbrances of any kind or character (other than any liens or encumbrances of any form arising from the Company Agreement or arising under applicable securities laws); and

      d.     to Henning's knowledge, there are no actions or proceedings pending or threatened involving the Redeemed Units.

5.     Release.  Henning, for herself and on behalf of each of her affiliates, agents, successors and assigns, estates, heirs, executors and representatives, as applicable (all of the foregoing being collectively referred to as the "Releasing Parties"), hereby voluntarily, completely and unconditionally, to the maximum extent permitted by applicable law, generally release, acquit, waive and forever discharge the Company, its members, managers, officers, employees, agents, representatives, successors and assigns (collectively, the "Released Parties"), from and against any and all liability, causes of action, demands and claims of whatever kind or character (past or present), whether known, suspected or unknown, vicarious, derivative, fixed or contingent, whether arising from breach of contract claims, any tort claims

2

Error! Unknown document property name.

EXHIBIT E

or claims of any statutory violations, of any kind or character, that any of the Releasing Party has or may hereafter have or assert against such Released Party based on any acts or facts existing as of the Effective Date, arising out of or connected in any way to the Company, its operations, business and assets, the Redeemed Units or this Agreement, including, without limitation, the fairness of the Redemption Price and claims for fraud, fraudulent inducement, negligent misrepresentation, or violation of fiduciary responsibilities and duties.

6.      Indemnity.  Henning shall indemnify, defend and hold harmless the Company, its successors and assigns, from and against any and all losses, damages, liabilities, claims, demands, judgments, settlements, costs and expenses (including attorneys' fees) resulting from or arising out of:

a.      any breach of any representation or warranty contained in this Agreement by Henning;

b.      the unexcused nonperformance, partial or total, of any covenant or agreement contained in this Agreement by Henning; and

c.      any claim related to the Redeemed Units arising out of events that first accrue or occur before the Effective Date.

7.      Future Cooperation on Subsequent Documents.  Henning and the Company mutually agree to cooperate at all times from and after the date hereof with respect to the supplying of any information requested by the other regarding any of the matters described in this Agreement, and each agrees to execute such further membership unit transfer powers, releases or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the transactions described herein.  Henning agrees that the Company (and its remaining members) may cause the Company Agreement to be amended to reflect that Henning has withdrawn as a member of the Company and that the Redeemed Units have been redeemed and cancelled.

8.      Successors and Assigns.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, legal representatives, successors and assigns. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated by any party hereto without the written consent of the other party.

9.      Survival of Representations.  The representations, warranties, covenants and agreements of the parties contained in this Agreement shall survive the execution hereof.

10.     Modification and Waiver.  No supplement, modification, waiver or termination of this Agreement or any provisions hereof shall be binding unless executed in writing by the parties to be bound thereby.  No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provision (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

11.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without reference to the conflicts of laws or choice of laws provisions thereof.

12.     Severability.  If any provision of this Agreement is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein will not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties will be enforceable to the fullest extent

3

Error! Unknown document property name.

EXHIBIT E

permitted by law. Any provision of this Agreement held invalid, illegal or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid, illegal or unenforceable.

13.     Counterparts.  This Agreement may be executed in any number of counterparts each of which shall be an original and all of which shall together constitute one and the same Agreement. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

14.     Attorneys' Fees and Costs.  If any action at law or in equity is brought to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which the prevailing party may be entitled.

15.     Entire Agreement.  This Agreement contains the entire understanding of the parties relating to the subject matter of this Agreement and supersede any and all other agreements, either oral or in writing, relating to the subject matter hereof. Each of the representations, warranties, covenants and agreements set forth herein shall be deemed to be independent, such that the breach by one party of provisions shall not excuse the performance by the non-breaching party of the other provisions herein.


[The next page is the signature page.]


4

Error! Unknown document property name.

EXHIBIT E

IN WITNESS WHEREOF, this Agreement is executed to be effective as of the Effective Date.

HENNING:

Ann C. Henning

COMPANY:

RISE SOUFFLE HOLDINGS, LLC

By:_____
     Hedda G. Dowd, Manager

Error! Unknown document property name.